UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| KENNETH LOUIS WILKERSON, | Case No. 16-cv-02757-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION AND DENYING DEFENDANT'S CROSS-MOTION** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF Nos. 23 & 24 |

## INTRODUCTION

Plaintiff Kenneth Wilkerson seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title II and Title XVI of the Social Security Act.[1] He moved for summary judgment;[2] the Commissioner opposed the motion and filed a cross-motion.[3] Under Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties consented to magistrate-judge

---

[1] Compl. – ECF No. 1 at 1 (¶ 4). Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Summary-Judgment Motion – ECF No. 23.

[3] Cross-Motion – ECF No. 24.

jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On November 10, 2011, Mr. Wilkerson, then age 47, filed claims for social-security disability insurance ("SSDI") benefits under Title II of the Social Security Act and supplemental security income ("SSI") benefits under Title XVI, alleging schizophrenia, glaucoma, back pain, and hypertension.[5] He alleges an onset date of August 12, 2010.[6] The Commissioner denied his SSDI and SSI claims initially and upon reconsideration.[7] On January 25, 2013, Mr. Wilkerson timely requested a hearing.[8]

On June 6, 2013, Administrative Law Judge Mary Parnow (the "ALJ") held a hearing, and Mr. Wilkerson asked to continue it to allow his counsel to appear.[9] Attorney Karen Woodley then represented Mr. Wilkerson,[10] and the ALJ rescheduled the hearing for October 3, 2013.[11] The ALJ heard testimony from Mr. Wilkerson and vocational expert Malcolm Brodzinsky,[12] who subsequently submitted a vocational interrogatory.[13] The ALJ issued an unfavorable decision on April 22, 2014.[14] The Appeals Council denied Mr. Wilkerson's request for review.[15] Mr.

---

[4] Consent Forms – ECF Nos. 9, 10.

[5] Administrative Record ("AR") 61, 80.

[6] *Id.*

[7] AR 78, 120 (determinations on SSI claim); AR 97, 141 (determinations on SSDI claim); *see also* AR 145–49 (initial denial letter); AR 150–51 (request for reconsideration); AR 152–56 (second denial letter).

[8] AR 157–58.

[9] AR 53–60; *see also* AR 190 (request for continuance).

[10] AR 194–97.

[11] AR 198–210.

[12] AR 34–52.

[13] AR 391–95.

[14] AR 13–33.

[15] AR 5–7.

Wilkerson timely filed this action on May 20, 2016[16] and moved for summary judgment.[17] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[18] Mr. Wilkerson filed a response.[19]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Dr. Gunnar Salumaa: Primary-Care Physician – Treating

From August 2008 until July 2010, Dr. Salumaa — who was Mr. Wilkerson's primary-care physician — treated him (with the assistance of other Kaiser Permanente staff) for high blood pressure, high cholesterol, asthma, and occasional lower back pain.[20] Dr. Salumaa prescribed an inhaler for his asthma,[21] a statin for his high cholesterol,[22] and ibuprofen and methocarbamol (a muscle relaxant) for his lower back pain.[23] He recommended consistently that Mr. Wilkerson improve his diet and quit smoking to reduce his blood pressure.[24] In November 2009, Dr. Salumaa diagnosed him with glaucoma and prescribed eye drops.[25]

#### 2.1.2 Dr. Stephen Tanaka: Ophthalmologist – Treating

On May 5, 2010, Mr. Wilkerson saw Dr. Tanaka (an ophthalmologist) because he had blurred vision and headaches when he stopped taking his glaucoma medicine five months earlier (due to its expense).[26] Dr. Tanaka noted that Mr. Wilkerson had elevated intraocular pressure.[27] Dr.

---

[16] Compl. – ECF No. 1; AR 1–2 (granting extension of time to file civil action).

[17] Summary-Judgment Motion – ECF No. 23.

[18] Cross-Motion – ECF No. 24.

[19] Reply – ECF No. 25.

[20] AR 401–33, 436–52, 456–57, 463–74, 498–503, 506–07.

[21] 419, 430, 438.

[22] 419, 430, 438.

[23] AR 405, 419, 430, 438.

[24] AR 405, 437–38, 447–51.

[25] AR 438.

[26] AR 453–55, 458–61 (visual-field study results).

Tanaka refilled his glaucoma medicine and stressed the importance of taking it and keeping his intraocular pressure under control.[28] On May 7, 2010, Dr. Tanaka's office called Mr. Wilkerson to remind him to resume his eye drops and keep his upcoming appointment with Dr. Choe.[29] Mr. Wilkerson showed up for his appointment with Dr. Choe, but he left before being seen.[30]

### 2.1.3 On-Call Physicians at Kaiser-Permanente – Treating

On November 1, 2009, Mr. Wilkerson called and spoke with an on-call physician.[31] Mr. Wilkerson reported dizziness and numbness on the left side of his face, but no paresthesia of the lips and hands, gait problems, visual changes, shortness of breath, palpitations, or chest pain.[32] The physician recommended that he call or return to the clinic if his symptoms did not improve.[33]

On June 7 and 15, 2010, Mr. Wilkerson went to the emergency room for treatment of back pain brought on by playing with his children. The treating physicians prescribed rest, ice, ibuprofen, and Percocet.[34]

### 2.1.4 Alameda County Medical Center Physicians – Treating

From 2010 to 2013, Mr. Wilkerson saw different medical providers at Alameda County Medical Center, primarily in the emergency department at the Highland Hospital location.[35]

In November 2010, an emergency physician refilled Mr. Wilkerson's prescription for high-cholesterol medicine and referred him to the ophthalmology department for his glaucoma.[36] The

---

[27] AR 454.

[28] *Id.*

[29] AR 462.

[30] AR 504.

[31] AR 434–35.

[32] AR 434.

[33] AR 435.

[34] AR 475–97.

[35] AR 530–558, 573–97, 604–98, 714–20.

[36] AR 546–49; *see also* AR 660–61.

chart notes state that Mr. Wilkerson "lost kaiser insurance," had "a few days left of meds," and "ran out of chol[esterol] meds months ago."[37]

In February 2011, an ophthalmologist examined Mr. Wilkerson twice.[38] Mr. Wilkerson went to the emergency room on February 24, 2011, and reported neck, back, head, and leg pain following a car accident that day.[39] After examination, the doctor discharged him with Vicodin, ibuprofen, baclofen, and instructions to follow up with his doctor as needed.[40]

On April 25, 2011, Mr. Wilkerson drove himself to the emergency room because he experienced chest pain after drinking alcohol and smoking marijuana that he suspected was laced with cocaine.[41] Mr. Wilkerson "eloped" before he could be discharged.[42]

On December 27, 2011, Mr. Wilkerson was treated for back-pain complaints.[43] He noted a history of back pain since February but indicated that it had been "improving with ibuprofen and muscle relaxants" until he bent over the night before.[44] Mr. Wilkerson reported that the pain radiated down both of his thighs.[45] He recounted his history of glaucoma, but he denied any vision changes and said he did not need to refill his medicine.[46] He said he "[w]ould like a work note" (even though he claimed in his disability applications and later in testimony before the ALJ that he had not worked since August 2010).[47] The doctor prescribed ibuprofen and Flexeril and refilled his cholesterol and blood-pressure medicine.[48]

---

[37] AR 546.

[38] AR 557–58.

[39] AR 544; *see also* AR 665–70.

[40] AR 544–45.

[41] AR 672.

[42] AR 673.

[43] AR 537

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*; AR 18 (ALJ noted that in his testimony at the October 2013 hearing and in his other filings, Mr. Wilkerson claimed that he had not been engaged in any substantial gainful activity since August 2010.)

[48] AR 538.

On January 17, 2012, Dr. Yasumoto recorded the following impression of Mr. Wilkerson's lumbar spine based on an x-ray:

> 1. Diffuse degenerative changes seen throughout the thoracolumbar spine with anterior wedge deformity involving T12, which is likely remote. No acute appearing fractures or malalignment are seen.
>
> 2. Bilateral hip joint degenerative changes.[49]

There are additional progress notes dating from January through May 2012.[50] In January, Mr. Wilkerson presented with lower-back and buttock pain, indicating that he had been experiencing it for 10 to 12 years and that it had returned in the past week as the result of his lifting a water bucket.[51] In May, Mr. Wilkerson presented with hip and chronic lower-back pain, noting its onset "5 days" earlier and indicating that it had been "off and on."[52]

Mr. Wilkerson went back to the ophthalmology department in 2012 and saw Dr. Chang,[53] who concluded that Mr. Wilkerson had severe visual acuity loss in his left eye.[54]

On May 2, 2012, Mr. Wilkerson had a physical for "DMV form completion."[55] The chart notes, written by a medical assistant, reflect he "used to be a commercial driver" but was currently unemployed.[56] The notes mention "vision 20/20" without additional elaboration.[57]

On May 15, 2012, Mr. Wilkerson saw an orthopedist, Dr. Patrick McGahan, and reported a "long history of back pain and bilateral hip pain."[58] Dr. McGahan observed Mr. Wilkerson had "mild tenderness to palpation" and could "flex and extend his back with minimum discomfort," but could not do straight leg raises without "pain in his lower back."[59] He had "5/5 strength from

---

[49] AR 551, 586–87.

[50] AR 580–82, 596.

[51] AR 582.

[52] AR 596.

[53] AR 595, 597.

[54] AR 597.

[55] AR 578.

[56] *Id.*

[57] *Id.*

[58] AR 654.

[59] *Id.*

L2-S1."[60] Mr. Wilkerson experienced "mild pain with flexion and internal rotation on the lateral aspect of his hips."[61] Based on his exam and x-rays, Dr. McGahan diagnosed Mr. Wilkerson with "bilateral mild hip osteoarthritis and lumbar degenerative di [*sic*] disease."[62] He recommended Motrin and physical therapy.[63]

In August 2012, following his HIV diagnosis, Mr. Wilkerson met with a social worker, who observed that he was "engaged, normally dressed, alert and oriented times 4, with normal speech, sad affect and depressed mood."[64] The social worker administered a PHQ-9 questionnaire, and Mr. Wilkerson "score[d] as mildly depressed."[65] Mr. Wilkerson reported "a history of crack use and denied past psychiatric/mental health issues."[66] Mr. Wilkerson told the social worker that he lived at Redemption and Recovery — a "transitional drug program" — but had to find his own housing in two months.[67] The social worker noted that Mr. Wilkerson "last worked as a Cal Trans heavy equipment operator and was laid off in 2010."[68] The social worker provided an Axis I diagnosis of major depression (recurrent-mild), deferred an Axis II diagnosis, gave an Axis III diagnosis of HIV, and provided an Axis IV diagnosis of "[l]ack of financial resources, lack of housing, unemployment."[69]

Mr. Wilkerson saw a doctor to discuss his HIV diagnosis and schedule follow-up lab work in October and December 2012.[70] He described his interest in sports.[71] She remarked that his "HIV

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] AR 609.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] AR 611–13; *see also* AR 717–20 (labs).

[71] AR 611, 613.

1 [was] stable."[72]

2 In November 2012, Mr. Wilkerson saw an orthopedist, Dr. Distefano, "for evaluation of lateral

3 hip pain in both hips."[73] Dr. Distefano diagnosed Mr. Wilkerson with lumbar degenerative disc

4 disease, mild hip arthritis, and iliotibial-band pain.[74] Dr. Distefano observed that Mr. Wilkerson

5 had an "antalgic gait," or limp, and could not squat due to hip pain.[75] He could toe walk, heel

6 walk, and stand on each leg.[76] Dr. Distefano noted that Mr. Wilkerson's physical therapy "has

7 been helping" with his low back and recommended that he continue it (with physical therapy) "to

8 work on core hip and knee strengthening."[77] He prescribed Voltaren.[78] Dr. Distefano noted that

9 Mr. Wilkerson had a history of substance abuse but had been "clean for over a year."[79]

10 In 2012 and early 2013, Mr. Wilkerson continued to be monitored for his glaucoma.[80]

11 On April 23, 2013, Mr. Wilkerson went to the emergency room at Highland Hospital after a

12 car struck him while he was riding his bike (without a helmet).[81] A CT scan showed no traumatic

13 injury but mild degenerative changes in the lumbar spine and thoracolumbar junction.[82] He had no

14 traumatic injuries or complications, and the hospital discharged him the following day with "20

15 tabs of Vicodin, Motrin, and Tylenol."[83] The chart notes reflect Mr. Wilkerson's history of drug

16 use and that he "ha[d] been clean for the last 18 months."[84] He went back to the emergency room

United States District Court
Northern District of California

19 [72] AR 613.

20 [73] AR 622.

21 [74] *Id.*

[75] *Id.*

22 [76] *Id.*

23 [77] *Id.*

[78] *Id.*; *see also* AR 624 (physical therapy referral).

24 [79] AR 622.

25 [80] AR 623, 625.

26 [81] AR 650–53, 656–58, 686–98.

[82] AR 697.

27 [83] AR 651–52.

28 [84] AR 652.

on May 10, 2013, for a refill of his pain medication.[85] He reported neck and back pain radiating down both of his legs.[86] The doctor remarked that he had "good range of motion," "no deformity" in his extremities, and a normal gait with use of his cane but "tenderness to palpation in the muscles of the bilateral thighs of the iliotibial band."[87] The doctor refilled Mr. Wilkerson's pain medication and recommended that he schedule an appointment with his primary-care doctor and chiropractor.[88]

On October 26, 2013, Mr. Wilkerson went to the emergency room because he smashed his thumb while "moving this afternoon."[89] His thumb was "well dressed," and nursing staff provided emotional support.[90]

### 2.1.5 The Dancy Chiropractic Group – Treating

After his bike accident, from late April to late May 2013, Mr. Wilkerson went for physical therapy at the Dancy Chiropractic Group (apparently at the suggestion of his lawyer).[91] Although he could not pay for all of his therapy, they agreed to treat him until his pain was mild to slight.[92]

In his May 1, 2013 treatment notes, "[Mr. Wilkerson] reports that his position requires physical work/ a lot of bending, lifting, stooping and sitting."[93] He "reports of an increase in low back pain at the end of the day."[94] The May 3rd treatment notes reflect that Mr. Wilkerson again reported "an increase in lumbar pain associated with prolonged standing and heavy lifting," he had "been placed on a light duty assignment while at work, and he was preluded "from lifting anything

---

[85] AR 650.

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] AR 715–16.

[90] *Id.*

[91] AR 700–13.

[92] AR 713.

[93] AR 705.

[94] *Id.*

over 25 pounds without assistance."[95] The May 8th treatment notes state that he reported "an increase in lumbar pain at the end of the day [because] his position requires excessive bending, stooping and standing."[96] He denied "taking over the counter pain medication."[97] The May 13th treatment notes say that Mr. Wilkerson reports that he was "performing activities which would aggravate his condition" but that "prolong[ed] sitting, standing, stooping and bending are required of his position."[98] The May 17th treatment notes state that "Mr. Wilkerson is frustrated with aggravating his condition with the activities he is required to perform while at work. He reports that bending and lifting are part of the position's requirements. Mr. Wilkerson reports that he can't afford to take any time off from work. Yet, he reports that he is careful when he is required to perform any activity which would aggravate his condition."[99] After several further treatment sessions, Mr. Wilkerson reported "an overall improvement in his thoracic spine" and "denie[d] any radiating sensations from his lumbar spine to his lower extremities."[100] His final evaluation report on May 29, 2013 noted that he had "no motor or sensory deficit," could walk "with a normal gait and [ ] without the assistance of any walking device," could get on and off the table without help, and had normal muscle strength.[101] The report concludes that his "prognosis is good."[102]

### 2.1.6   Dr. John Conger: Psychologist – Examining

In June 2011, Dr. Conger completed a one-page "Doctor's Certificate" for Mr. Wilkerson's California disability-claim application.[103] Dr. Conger identified the primary "ICD9 disease code"

---

[95] AR 704.

[96] *Id.*

[97] *Id.*

[98] AR 703.

[99] AR 702.

[100] *Id.*

[101] AR 712–13.

[102] AR 713.

[103] AR 528.

as 295.30 (paranoid schizophrenia) and remarked that "the patient hears voices, feels invaded, wants to be alone, has paranoid ideation, [and] awkward and restless movements."[104] Dr. Conger wrote, "I find the client very disturbed [and] uncomfortable."[105] Under "type of treatment/medication rendered to patient," Dr. Conger wrote "medication needed."[106] Dr. Conger indicated that Mr. Wilkerson had been unable to perform his regular job since June 13, 2011, and noted "[illegible] 2 years ago."[107]

### 2.1.7 Dr. Eugene McMillan: Physician – Examining

In February 2012, Dr. McMillan, at the request of the State agency, evaluated Mr. Wilkerson.[108] He reviewed Mr. Wilkerson's medical history, conducted a physical examination, and reported the following impressions: glaucoma, severe left-eye visual impairment, arthritis, and low back pain with evidence of degenerative disease of the lumbar and thoracic spine.[109]

Dr. McMillan noted that Mr. Wilkerson reported that he had been told that he was "paranoid" and "state[d] that he hears voices."[110] Mr. Wilkerson stated that he "stopped all of his medications a couple of years ago."[111] Dr. McMillan noted that "[t]hroughout the exam[,] [Mr. Wilkerson] was constantly looking out the door and checking to see if someone was attempting to enter the room."[112] Dr. McMillan reported that he "did not feel comfortable shutting the examination room door during the claimant's exam."[113] He provided the following functional capacity assessment:

> The claimant has history of a psychiatric disorder, which is not currently being treated. Standing and walking would be for six hours per day. Sitting would be for

---

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] AR 568–71.

[109] AR 571.

[110] AR 569.

[111] *Id.*

[112] AR 570.

[113] *Id.*

six hours per day. He is not currently using an assistive device. He would be able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He does have significant visual problems with his left eye, but his visual acuity is corrected with glasses in the right eye. There would be no manipulative limitations. There would be no environmental limitations. He would be able to engage in activities that require bending, stooping and kneeling for at least four hours in an eight-hour workday.[114]

### 2.1.8  Dr. Cecilia Hardey: Psychologist – Examining

In February 2012, Dr. Hardey, at the request of the State agency, evaluated Mr. Wilkerson.[115] She administered a comprehensive psychological evaluation, including Wechsler Adult Intelligence and Memory tests and the Bender Visual-Motor Gestalt test.[116] Dr. Hardey concluded Mr. Wilkerson had cognitive abilities and memory in the low average to average range and suffered no visual-motor integration impairments. She remarked, however, that she could not complete the Wechsler testing and reached her conclusion without data on processing speed because Mr. Wilkerson could not see the stimulus material clearly enough.[117]

Dr. Hardey observed that Mr. Wilkerson had normal speech and consciousness and was oriented and cooperative.[118] Mr. Wilkerson took public transportation, arrived early for his appointment, dressed casually, and had good hygiene.[119] He lost his glasses and could not afford to replace them.[120] He preferred being outdoors and enjoys riding his bike.[121] She described him as a "worried, hyper-vigilant individual who was looking around constantly, startling, looking at the door, and appeared to be worried that someone would come in."[122] She remarked that there "did not appear to be evidence of psychosis," but Mr. Wilkerson's "[m]ood was anxious and

---

[114] Id.

[115] AR 562–65.

[116] AR 562.

[117] AR 563.

[118] AR 562.

[119] Id.

[120] Id.

[121] Id.

[122] Id.

depressed."[123] She stated Mr. Wilkerson was a "poor historian" who had "a great deal of difficulty remembering any of his history."[124]

Mr. Wilkerson "denied any felony or misdemeanor convictions," but reported that he previously used marijuana and had been addicted to cocaine and stopped using all substances four months earlier, when he began residing at a church-sponsored sober living facility called Redemption and Recovery.[125] He "had to quit working in 2010 because he was hearing voices" but he had "never been prescribed [any] psychotropic medication to relieve this symptom."[126] He recounted that he had glaucoma, blindness in his left eye, back pain, and hypertension.[127]

Dr. Hardey gave an Axis I diagnosis: (1) "Rule out psychotic disorder probably secondary to poly-substance abuse"; (2) "Alcohol, cocaine, and cannabis dependency, in remission, status post 4 months per applicant — no corroborating medical records"; and (3) "Mood disorder, secondary to substance abuse."[128] She did not give an Axis II diagnosis but gave an Axis III diagnosis of hypertension, glaucoma, and back pain.[129]

Dr. Hardey ultimately concluded:

> This individual gave the impression of someone who has a psychotic process going on. He is hyper-vigilant. He appeared to be attending to internal stimuli at times during the assessment. He has at least low-average cognitive abilities. There was no evidence of memory or visual-motor integration deficits. He has been in a residential church-sponsored drug and alcohol recovery program for the last four months and alleges sobriety from that date. He has never been prescribed anti-psychotic medication though a psychologist who saw him recently recommended it. This examiner also believes that this would probably be an appropriate referral. He probably cannot work at this point. At minimum, he needs a psychiatric consultation to determine the nature of his symptoms and, possibly prescribe appropriate medication.[130]

---

[123] Id.

[124] Id.

[125] AR 562–63.

[126] AR 563.

[127] Id.

[128] AR 564.

[129] Id.

[130] Id.

Dr. Hardey opined that Mr. Wilkerson did not have the ability to manage his financial interests in his own best interests due to his substance-abuse history and his psychotic symptoms.[131] She found that he had the following work-function impairments: moderate to severe impairments of his abilities to (1) adapt to changes in job routine, (2) withstand the stress of a routine workday, (3) maintain emotional stability and predictability, and (4) interact appropriately with coworkers, supervisors, and the public on a regular basis.[132] He had moderate impairments of his abilities to (1) follow and remember complex and detailed instructions, (2) maintain adequate pace or persistence to perform complex tasks, (3) maintain adequate attention and concentration, and (4) communicate with others both verbally and in writing.[133] He had mild to moderate impairments of his abilities to follow and remember simple instructions and maintain adequate pace or persistence to perform simple repetitive tasks.[134]

### 2.1.9   Dr. Sokley Khoi: Psychologist – Examining

In November 2012, Dr. Khoi, at the request of the State agency, evaluated Mr. Wilkerson.[135] She administered Wechsler Adult Intelligence and Memory tests and a Trail Making Test.[136] She generally found Mr. Wilkerson's cognitive abilities were in the extremely low range but stated that the "test results are likely to underestimate his cognitive functioning" because he "discontinued tasks prematurely stating it was exacerbating his pain, that he could not see well, or it was 'too frustrating' for him."[137] She remarked that his performance "was significantly affected by his psychiatric symptoms."[138]

Dr. Khoi observed that Mr. Wilkerson "was cooperative, but appeared hyper vigilant and

---

[131] AR 564.

[132] AR 564–65.

[133] *Id.*

[134] AR 564.

[135] AR 600–603.

[136] AR 600.

[137] AR 601–03.

[138] AR 603.

paranoid."[139] Mr. Wilkerson was restless and fidgety, looking around the examination room; "[h]e kept telling the examiner 'I'm not crazy. I have no mental health problems. I just have pain.'"[140] Mr. Wilkerson also "denied [any] auditory or visual hallucinations but appeared internally preoccupied."[141] Dr. Khoi remarked that his "[a]ffect and mood were anxious and depressed," but that he had a linear and coherent thought process with "no indication of delusional ideation."[142]

Mr. Wilkerson reported his glaucoma caused blindness in one eye and that he suffered from pain in his back and hips, hypertension, high cholesterol, and HIV.[143] Mr. Wilkerson "reported symptoms of insomnia, decreased appetite, anhedonia, and low energy."[144] He said, "I'm sad a lot and a lot of time I don't feel good. I don't feel like doing anything. I just stay in bed. I don't like being around people."[145]

Mr. Wilkerson reported not having any "legal history" but "reported a history of significant substance abuse including alcohol, cocaine, and cannabis 'for a long time.'"[146] "He stated that he stopped using drugs 'maybe a year ago.'"[147] He had been living at the church-sponsored Redemption and Recovery since November 2011.[148] Mr. Wilkerson reported that "he is able to perform all activities of daily living with restrictions due to psychiatric symptoms" including managing his finances.[149]

Dr. Khoi gave an Axis I diagnosis: "depressive disorder NOS, probable psychotic disorder NOS, and polysubstance abuse/dependence, in remission for approximately one year per

---

[139] AR 601.

[140] Id.

[141] Id.

[142] Id.

[143] AR 600–01.

[144] AR 600.

[145] Id.

[146] AR 601.

[147] Id.

[148] AR 600.

[149] AR 601.

claimant."[150] She deferred any Axis II or Axis III diagnoses.[151] Dr. Khoi's findings "suggest depression and possible psychosis," and she remarked that Mr. Wilkerson "may benefit from psychotropic medications and individual psychotherapy."[152]

Dr. Khoi indicated that Mr. Wilkerson had marked limitations of his abilities to maintain adequate pace or persistence to perform complex tasks and withstand the stress of a routine work day.[153] Mr. Wilkerson had moderate to marked limitations of his abilities to follow and remember complex or detailed instructions, adapt to changes in job routine, and interact appropriately with coworkers, supervisors, and the public.[154] Mr. Wilkerson had mild to moderate limitations of his abilities to follow and remember simple instructions and maintain adequate pace or persistence to perform simple repetitive tasks.[155]

### 2.1.10  Save a Life Wellness Center

From May 2013 through October 2013, Mr. Wilkerson went to Save a Life Wellness Center in Oakland for medical treatment and prescription refills.[156] At intake on May 20, 2013, Mr. Wilkerson reported hypertension, glaucoma, HIV, and hearing voices.[157] He indicated that he had been evaluated by a disability psychologist on two occasions, but had never been hospitalized for psychiatric illness.[158] He had a 15-year history of substance abuse that included incarceration for drug-related crimes (from 1997 to 2000 and parole until 2002), but had been clean and sober for 19 months.[159] He lived in a residential-treatment program, used public transportation, and had not

[150] AR 602.

[151] *Id.*

[152] *Id.*

[153] AR 603.

[154] *Id.*

[155] *Id.*

[156] AR 628–31, 633–37, 722–28.

[157] AR 635.

[158] *Id.*

[159] *Id.*

worked for several years.[160] The provider who completed the intake form diagnosed Mr. Wilkerson with major depressive disorder and recommended antidepressants and therapy on a "PRN" or as needed basis.[161] This provider marked that Mr. Wilkerson was oriented, appropriate in affect, cooperative, and not gravely disabled but was depressed, slow in psychomotor pace, and questionably psychotic.[162] At his follow-up appointments, Mr. Wilkerson received Celexa and Risperdal for his mental health and medicine for his high blood pressure, high cholesterol, asthma, glaucoma, and back pain.[163]

### 2.1.11  Sausal Creek Outpatient Stabilization Clinic

On May 29, 2013, Mr. Wilkerson went to Sausal Creek Outpatient Stabilization Clinic for "medication and a referral."[164] A staff member (whose name is not legible but who appears to be an "LVN" or licensed vocational nurse) completed a crisis-assessment form reflecting that Mr. Wilkerson was depressed, had anxiety and decreased sleep, and was hearing voices (auditory hallucinations) telling him that he was "worthless."[165] Mr. Wilkerson stated that "I am depressed, diagnosed one year ago [with] HIV."[166] He wanted "medication for voices."[167] Mr. Wilkerson said that he was "sick" and "wanted to die," but had no "plan or intent."[168] He stated that he had been "clean for 19 months," and the "drug/alcohol screen" was "negative."[169] At the risk-screening stage, a staff member marked that Mr. Wilkerson was not in danger of self-harm, harming others,

---

[160] *Id.*; *but compare* AR 702–05 (May 2013 reports (same year and month) from Mr. Wilkerson's chiropractor noting Mr. Wilkerson's statements regarding his current work status and its physical requirements).

[161] P.R.N. is an abbreviation for the Latin term "pro re nata" or "as circumstances require" or "as needed."

[162] AR 636.

[163] AR 628–31, 633, 722–28.

[164] AR 643.

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] AR 643–44.

serious self-neglect, victimization, or alcohol and drug abuse.[170] The staff member evaluated Mr. Wilkerson's mental status and indicated that he was alert, oriented, distracted, poorly to fairly groomed, and had slow speech, anxious mood, flat affect, marginal insight, marginal judgment, an internally preoccupied thought process, paranoia, and hallucinations.[171] A staff member identified as an "LVN" (or licensed vocational nurse) assessed Mr. Wilkerson with a GAF score of 45 and a primary diagnosis code of "311," which is the diagnostic code for depressive disorder.[172]

Later that morning, he presented to the psychiatrist with self-reported auditory hallucinations, depression, anxiety, sleep issues, and feelings of being "very isolated."[173] He reported a history of substance abuse and said that he "last used 19 months ago."[174] The psychiatrist, who had no prior relationship with Mr. Wilkerson, conducted a 15-minute mental status evaluation and circled various "Mental Status" descriptors, finding that Mr. Wilkerson was sedated, oriented to person, place, and time, avoidant, and poorly groomed and had slow speech, depressed mood, constricted affect, poor insight, logical thought processes, and hallucinations.[175] The psychiatrist primarily diagnosed him with depressive disorder NOS (not otherwise specified) and prescribed Celexa and Risperdal.[176] The psychiatrist noted that it was "the client's first contact with a psychiatrist" and "first psychotic break."[177] The psychiatrist assigned Mr. Wilkerson an Axis V/GAF rating of 45 and did not provide any discussion of the reasons for that medical opinion.[178]

The facility discharged him shortly thereafter with prescriptions for Celexa and Risperdal and

---

[170] AR 645.

[171] AR 646.

[172] *Id.* A GAF score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. *See Garrison v. Colvin,* 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'").

[173] AR 640.

[174] AR 641.

[175] AR 642.

[176] *Id.*

[177] *Id.*

[178] *Id.*

instructions to follow up in seven days for more medication and to "ASAP" schedule "a regular psychiatrist appointment" through Alameda County Medi-Cal's Access program.[179] Other than his ongoing follow-ups regarding the medications (Celexa and Risperdal) for his mental symptoms, it does not appear that Mr. Wilkerson thereafter sought or received any "regular" psychiatric treatment or therapy.

### 2.1.12 Dr. Lace: Psychologist – Consulting

In December 2013, after his October ALJ hearing, Dr. Lace completed a medical interrogatory for the ALJ based on a review of Mr. Wilkerson's medical records.[180] Dr. Lace concluded Mr. Wilkerson had an unspecified depressive disorder, major depressive disorder (recurrent-mild), mood disorder secondary to substance abuse, and "poly-substance abuse/dependence in alleged remission."[181] Dr. Lace concluded these impairments did not meet the applicable listings or paragraph B and C criteria, and so he found Mr. Wilkerson had the following RFC:

> Setting with routine, simple, repetitive tasks with less than average emphasis on production quotas and speeded tasks. Limited to brief and superficial contact [with] supervisors, co-workers, and the general public. No contact with alcohol (or other illicit drugs) in job setting."[182]

His notes state that Mr. Wilkerson had "no history of psychiatric hospitalizations," "very few GAF scores" (though he noted the GAF score of 45 from the Sausal Creek Outpatient Stabilization Clinic), "little in terms of treatment," "therapy [ ] recommended only PRN [as needed]," and "polysubstance abuse/dependency remission not supported by ongoing [urinalysis]."[183] Dr. Lace stated that Mr. Wilkerson's "stopping all medications 2 years ago [ ] may have led to paranoia and 'hearing voices.'"[184]

---

[179] AR 639 (also filed as AR 626, 632).

[180] AR 378–82 (also filed as AR 741–45).

[181] AR 378.

[182] AR 382.

[183] AR 379.

[184] *Id.*; *see also* AR 569 (Dr. McMillan noting that Mr. Wilkerson "stopped all of his medications a couple of years ago.")

United States District Court
Northern District of California

Dr. Lace completed a check-off report.[185] He found that Mr. Wilkerson had marked limitations of his ability to understand, remember, and carry out complex instructions.[186] Mr. Wilkerson had moderate limitations of his (1) ability to carry out simple instructions, (2) make judgments on both simple and complex work-related decisions, (3) interact appropriately with coworkers, supervisors, and the general public, and (4) respond appropriately to usual work situations and changes.[187] Dr. Lace opined that Mr. Wilkerson had mild limitations of his ability to understand and remember simple instructions.[188] Dr. Lace noted that Mr. Wilkerson would have "challenges with complex tasks and stress management associated with the above [impairments]."[189]

### 2.2 Mr. Wilkerson's Testimony

At the ALJ hearing, Mr. Wilkerson testified that he completed junior college in 1982.[190] He previously worked for Flow Serve in a "dangerous" and "labor intensive job" as a technician who "stopped high pressure leaks in oil refineries."[191] He worked as a semi-truck driver but can no longer have a Class A license because of the blindness in his left eye.[192] Mr. Wilkerson testified that his last job was from 2006 to 2010, when he worked for the California Department of Transportation as a heavy-equipment operator tasked with using backhoes, tractors, trailers, and excavating equipment.[193] When he was arrested and jailed for public intoxication, he missed worked and was fired for being "AWOL."[194]

He stopped work because he "started hearing voices and started being very depressed."[195] He

---

[185] AR 383–85 (also filed as AR 746–48).

[186] AR 383.

[187] AR 383–84.

[188] AR 383.

[189] Id.

[190] AR 40.

[191] AR 39.

[192] Id.

[193] AR 38–39.

[194] AR 40–41.

[195] AR 40.

hears voices telling him "terrible things or things that are not good."[196] The voices tell Mr. Wilkerson that he is "worthless," "people don't want to be around [him]," "people are laughing at [him] [and] talking about [him]."[197] He hears voices and feels depressed every day.[198] He tried to get a job after he was fired, but "the voices became worse and [the] depression became worse."[199]

On a scale of 1 to 10 Mr. Wilkerson indicated that he had back, hip, and leg pain of 8.5, 7, and 8 (respectively) during the hearing.[200] He brought his cane (prescribed by his doctor) to the hearing to help with his balance.[201] Mr. Wilkerson is HIV positive but does not yet have AIDS. He worries that he will get sick if he goes out in public, and so he likes to keep to himself.[202]

Mr. Wilkerson cooks for himself using a microwave, can walk between a half block and one block to pick up light items from the store, and cleans occasionally when his pain is manageable (but afterwards, he must lie down or sit with his legs elevated).[203] He can sit for roughly 20 minutes and stand in place for 10 to 15 minutes at a time.[204] Mr. Wilkerson has three or four bad days each week; on these days, "pain is very excruciating where [he] [has] to normally pretty much sit down with my legs elevated or lay down in the bed with my legs elevated."[205]

Mr. Wilkerson goes to Save a Life[206] every 30 days for his medication and Highland Hospital every three months for HIV treatment, and he was resuming physical therapy for his back.[207] At the time of the hearing, Mr. Wilkerson had been clean for roughly two years.[208]

---

[196] AR 43.

[197] Id.

[198] Id.

[199] AR 41.

[200] AR 41–42.

[201] AR 42, 48.

[202] AR 43–44.

[203] AR 44–45.

[204] AR 45.

[205] AR 46.

[206] While the hearing transcript states Mr. Wilkerson goes to "Stable Life," his medical records are actually from (the similar sounding) "Save a Life."

[207] AR 47.

[208] AR 48.

### 2.3 Thai Ivery – Mr. Wilkerson's Friend

In January 2012, Mr. Wilkerson's friend, Thai Ivery, completed a third-party function report.[209] Mr. Ivery has known Mr. Wilkerson for 42 years and sees him "5–10 hours per week and 4 hours on Sundays."[210] Mr. Wilkerson lives at Redemption and Recovery where he "does a lot of reading, and praying while trying to control his issues."[211] Mr. Wilkerson has trouble sleeping because of his pain and the voices he hears.[212] Before Mr. Wilkerson got sick, he liked to spend time with friends and family.[213] Generally, Mr. Wilkerson can care for and groom himself, but he sometimes needs reminders and has "a hard time washing his back."[214]

Mr. Wilkerson does laundry and cleans the common areas at the rehabilitation facility three times a week, but he cannot do all of the chores due to his severe pain.[215] He can prepare sandwiches, frozen food, and "complete meals."[216] With the other residents, Mr. Wilkerson eats dinner, which is prepared as a group meal by the facility cook.[217] Mr. Wilkerson drives and uses public transportation, pays bills, goes to church, goes shopping once a week (although it takes him awhile), and goes outside often.[218]

Mr. Ivery indicated that Mr. Wilkerson's conditions impact his ability to lift, squat, bend, stand, sit, kneel, hear, climb stairs, see, remember, complete tasks, concentrate, and get along with others.[219] When asked how Mr. Wilkerson's conditions impact his abilities, Mr. Ivery wrote, "back pain, and some motor skills and hearing voices, and seeing objects."[220] Mr. Wilkerson

---

[209] AR 271–78.

[210] AR 271.

[211] *Id.*

[212] AR 272.

[213] *Id.*

[214] AR 272–73.

[215] AR 273–74.

[216] AR 273.

[217] *Id.*

[218] AR 274–75.

[219] AR 276.

[220] *Id.*

cannot walk very far before he needs to rest for "a few minutes."[221] He generally finishes what he

starts and can follow written instructions "well," but his ability to pay attention "depends on his

focus."[222] He can follow spoken instructions "fair to good."[223] Mr. Wilkerson gets frustrated

sometimes because his conditions prevent him from doing things that he used to be able to do.[224]

Mr. Ivery "really dislike[s] that he hears voices or believes someone is talking and they are not."[225]

Mr. Ivery wrote that Mr. Wilkerson needs glasses all the time.[226] Mr. Ivery concluded by stating:

"I would be grateful when he gets the help his condition has him to need. I been around him for

over 42 years and he has changed drastically."[227]


### 2.4 Vocational Expert Testimony

Malcolm Brodzinsky, a vocational expert, testified at the hearing on October 3, 2013. He

classified Mr. Wilkerson's past work — as a heavy equipment operator, a heavy truck driver, and

a gas company technician — as skilled and semi-skilled jobs requiring medium physical

demands.[228] In February 2014, the ALJ sent Mr. Brodzinsky a vocational interrogatory.[229]

The ALJ posed a hypothetical based on an individual born in 1964, with a high-school education,

English proficiency, Mr. Wilkerson's past work experience, and the residual functional capacity

> to perform light work [ ] except sitting six hours in an eight-hour day, standing and
> walking for six hours in an eight-hour day, lifting and carrying 20 pounds
> occasionally and 10 pounds frequently, bending, stooping, and kneeling for four
> hours in an eight-hour day that does not require binocular vision and involves
> simple, repetitive tasks with less than average emphasis on production quotas and
> speeded tasks, limited to brief and superficial contact with supervisors, coworkers,
> and the general public and no contact with alcohol or illicit drugs in the job

---

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] AR 277.

[225] *Id.*

[226] *Id.*

[227] AR 278.

[228] AR 51.

[229] AR 391–95.

setting.[230]

Mr. Brodzinsky answered that such an individual could not perform Mr. Wilkerson's past work but could work as a "bottling line attendant" or "housekeeping cleaner."[231]

## 2.5 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Mr. Wilkerson was disabled and concluded he was not.[232]

At step one, the ALJ found that that Mr. Wilkerson had not engaged in substantial gainful activity since his alleged onset date of August 12, 2010, and met the insured status requirements through December 31, 2015.[233]

At step two, the ALJ found that Mr. Wilkerson had the following severe impairments: "degenerative disc disease of the lumbar spine, monocular vision secondary to a left eye visual impairment, diabetes mellitus,[234] a major depressive disorder with possible psychotic features, and polysubstance abuse in reported remission."[235]

At step three, the ALJ found that Mr. Wilkerson did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[236] Mr. Wilkerson's degenerative disc disease did not meet Listing 1.04 because there was no evidence of "nerve root compression characterized by pain, limitation of motion in the spine, motor loss and sensory or reflex loss."[237] The evidence of Mr. Wilkerson's visual impairments was not sufficient to

---

[230] AR 393.

[231] AR 394.

[232] AR 18–26.

[233] AR 18.

[234] Metformin, a diabetes medicine, is listed in Mr. Wilkerson's medication list for the period of July through August 2013. (AR 371.) There is no record of a diabetes diagnosis, and Mr. Wilkerson does not allege or argue this is one of his impairments. Thus, the court does not address it here.

[235] *Id.*

[236] AR 19.

[237] *Id.*

"associate the criteria for any Listing level visual impairment under Section 2.00 *et seq.*"[238] Mr. Wilkerson's mental impairments, individually or combined, did not meet Listings 12.03 or 12.04 and the paragraph B criteria because the evidence did not show repeated episodes of decompensation and at least two marked functional limitations.[239] Rather, Mr. Wilkerson had only mild restrictions of his activities of daily living and moderate difficulties in social functioning and "concentration, persistence, or pace."[240]

At step four, the ALJ determined Mr. Wilkerson had the residual functional capacity ("RFC") to perform light work with

> sitting for 6 hours in an 8 hour day, standing/walking for 6 hours in an 8 hour day, lifting/carrying 20 pounds occasionally and 10 pounds frequently, and bending/stooping/kneeling for 4 hours in an 8 hour day, not requiring binocular vision, involving simple, repetitive tasks with less than average emphasis on production quotas and speeded tasks, no more than brief and superficial contact with supervisors, coworkers and the general public and no contact with alcohol or illicit drugs.[241]

At step five, the ALJ found Mr. Wilkerson could not perform his past relevant work as a highway maintenance worker or a maintenance technician.[242] The ALJ found that Mr. Wilkerson could work as a "bottling line attendant" or "housekeeping cleaner."[243] The ALJ concluded that he was not disabled.[244]

**ANALYSIS**

**1. Standard of Review**

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

---

[238] *Id.*

[239] AR 19–20.

[240] AR 20.

[241] *Id.*

[242] AR 25.

[243] AR 26.

[244] *Id.*

are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## 2. Applicable Law

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified

impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

### 3. Application

Mr. Wilkerson contends the ALJ erred at step four in determining his RFC because she improperly discounted or disregarded (1) the medical opinions of the psychiatrist at Sausal Creek Outpatient Stabilization Clinic, Dr. Khoi, Dr. Hardey, and Dr. Conger regarding the severity of Mr. Wilkerson's mental impairments, (2) Mr. Wilkerson's own testimony regarding the severity of his impairments, and (3) the third-party statement of his close and long-time friend, Mr. Ivery.[245] The court reviews each contention in turn.

---

[245] Summary-Judgment Motion – ECF No. 23 at 9.

### 3.1 Medical Opinion Evidence

Mr. Wilkerson contends the ALJ provided insufficient reasons for rejecting the medical opinions of the psychiatrist at Sausal Creek Outpatient Stabilization Clinic, Dr. Khoi, Dr. Hardey, and Dr. Conger.[246]

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians (and other "acceptable medical sources"): (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ, however, may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is

---

[246] *Id.*

United States District Court
Northern District of California

contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when she "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

In addition to the medical opinions of the "acceptable medical sources" outlined above, the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." *See* 20 C.F.R. § 416.927(f)(1). An "ALJ may

discount the testimony" or opinion "from these other sources if the ALJ gives … germane [reasons] . . . for doing so." *Molina*, 674 F.3d at 1111 (internal quotations and citations omitted).

### 3.1.1   Sausal Creek Outpatient Stabilization Clinic

Mr. Wilkerson contends that the ALJ failed to provide sufficient (or any) reasons for rejecting medical-opinion evidence from the Sausal Creek Outpatient Stabilization Clinic psychiatrist and other medical providers at the Clinic, including failing to consider the Global Assessment of Functioning ("GAF") score of 45 that was assigned to him by the psychiatrist and by the intake nurse.[247] "'A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.'" *Garrison*, 759 F.3d at 1002 n.4 (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998)). "According to the DSM–IV, a GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Id.* "Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." *Id.*; *see Graham v. Astrue*, 385 F. App'x 704, 706 (9th Cir. 2010) ("[Claimant] correctly points out that the GAF scores are not dispositive . . . [b]ut the GAF scores are nonetheless relevant."); *see also* Admin. Message 13066, sec. E (July 22, 2013) (noting that "when [a GAF score] comes from an acceptable medical source," the SSA considers that the "GAF rating is a medical opinion" to be considered with "all of the relevant evidence in the case file"); *but see McFarland v. Astrue*, 288 F. App'x 357, 359 (9th Cir. 2008) ("[t]he Commissioner has determined [that] the GAF scale 'does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings.'" (quoting 65 Fed. Reg. 50,746, 50,765) (Aug. 21 2001)).

Here, the GAF scores and other mental-health assessments are from both "acceptable medical

---

[247] Summary-Judgment Motion – ECF No. 23 at 13–14; *see also* AR 642 (psychiatrist assigning an Axis V /GAF score of 45); AR 646 (intake nurse also assigning a GAF score of 45).

source" and "other source" providers (though neither likely would qualify as "treating" medical

providers). Nevertheless, even if they were treated only as "examining" medical providers, the

ALJ has an obligation to consider these opinions in her decision. *Garrison*, 759 F.3d at 1012–13

(an ALJ errs if she "rejects a medical opinion or assigns it little weight" without explanation or

without explaining why "another medical opinion is more persuasive"). The court notes that these

GAF scores were the product of short, one-time observations and were not supported by additional

detailed clinical findings or explanations by the medical providers, but still, the failure of the ALJ

to specifically consider the GAF scores and the other medical opinions from the examinations or

provide an explanation for rejecting them was error. *See id.* Moreover, given that Mr. Wilkerson's

assigned GAF score of 45 equates to a finding of a "serious symptom" or an "impairment in

social, occupational, or school functioning," *id.* at 1002 n.4 (internal quotations and citations

omitted), the court declines to find this error to be harmless. *See Molina*, 674 F.3d at 1111.


### 3.1.2   Dr. Khoi

The ALJ gave "no weight" to Dr. Khoi's conclusions, finding that they were (1) "inconsistent

with the claimant's history of limited mental health treatment and [(2)] Dr. Khoi's examination

was incomplete because the claimant did not complete psychological testing."[248]

While a claimant's lack of treatment can be evidence of the lack of severity of such claimant's

reported symptoms, *see, e.g.*, *Orn*, 495 F.3d at 636, the Ninth Circuit has cautioned that in the area

of mental health, the fact that a claimant "may have failed to seek psychiatric treatment for his [or

her] mental condition" should not be used to "chastise one with a mental impairment for the

exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th

Cir. 1996) (internal quotation marks omitted); *Ferrando v. Comm'r of Soc. Sec. Admin.*, 449 F.

App'x 610, 611–12 (9th Cir. 2011) ("[F]ailure to seek treatment for his mental illness . . . is not a

clear and convincing reason to reject his [treating] psychiatrist's opinion, especially where that

failure to seek treatment is explained, at least in part, by [the claimant's] degenerating condition.")

---

[248] AR 24.

1 (citing *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999).

2 In *Regennitter*, the Ninth Circuit also held that if a claimant could not afford treatment, failure

3 to seek treatment was not a legitimate basis for rejecting a disability claim. 166 F.3d at 1297;

4 *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995) ("'It flies in the face of the patent purposes of

5 the Social Security Act to deny benefits to someone because he is too poor to obtain medical

6 treatment that may help him.'") (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)).

7 Here, the ALJ did not undertake a specific assessment of whether Mr. Wilkerson's limited

8 mental-health treatment history was based on the lack of severity of his impairments or instead

9 was at least in part attributable to his mental impairments and/or his financial constraints. The

10 record does reflect that Mr. Wilkerson lost his insurance in 2010 and could not pay for his

11 physical therapy appointments with his chiropractor or for new eyeglasses.[249] Whether his mental

12 health and financial issues also impacted his ability to seek (and comply with) mental-health

13 treatments is not clear. Under these circumstances, however, the court finds that the ALJ's brief

14 and conclusory statements regarding Mr. Wilkerson's limited treatment to be an insufficient basis

15 for rejecting Dr. Khoi's opinion.

16 The ALJ's second reason for discounting Dr. Khoi's opinion — Mr. Wilkerson did not fully

17 complete all of the cognitive assessment tests — is not, in these circumstances, a legitimate reason

18 supported by substantial evidence in the record for disregarding Dr. Khoi's opinion. Specifically,

19 Dr. Khoi administered numerous psychological tests and acknowledged that the test results "likely

20 [ ] underestimate [Mr. Wilkerson's] cognitive functioning" because Mr. Wilkerson's physical

21 impairments (vision, pain) and psychiatric symptoms prevented him from finishing all of the

22 tasks.[250] Dr. Khoi accounted for this limitation, in part, by reconciling and adopting the prior

23 cognitive testing results from earlier that year to conclude that Mr. Wilkerson's cognitive abilities

24 are "at least in the low average range."[251] Furthermore, Dr. Khoi's psychological evaluation was

25

26 _____

27 [249] AR 546, 562, 713.

[250] AR 601, 603.

28 [251] AR 603.

based upon information beyond just the tests that were not fully completed and included not only the psychological tests he was able to complete (incorporating the results of previous tests conducted by others), but also her own observations, diagnoses, and assessments of Mr. Wilkerson's condition.[252] In these circumstances, the court finds that the ALJ's proffered reason (of incomplete testing) to reject all of Dr. Khoi's conclusions is not a sufficient or legitimate reason to reject (and give no weight) her opinion (as an "acceptable medical source").

### 3.1.3  Dr. Hardey

The ALJ gave "limited weight to Dr. Hardey's conclusions to the extent that they suggest that the claimant would be limited in his capacity for work in the absence of substance abuse."[253] Specifically, the ALJ rejected Dr. Hardey's finding that Mr. Wilkerson had moderate to severe limitations in several areas[254] because "she attributed his psychiatric symptoms to substance abuse."[255] Mr. Wilkerson contends this is error because "Dr. Hardey's diagnosis of alcohol and drug dependency was based on [his] report of his past abuse, not on his medical records or her observations" of present abuse.[256]

"A finding of 'disabled' under the five-step inquiry does not automatically qualify a claimant for disability benefits." *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). "Under 42 U.S.C. § 423(d)(2)(C), a claimant cannot receive disability benefits 'if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.'" *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting 42 U.S.C. § 423(d)(2)(C)) (alteration in original).

The Ninth Circuit has held that when a Social Security disability claim involves substance abuse, the ALJ must first conduct the five-step sequential evaluation *without* determining the

---

[252] AR 600–03.

[253] AR 24.

[254] *See* AR 564–65.

[255] AR 24.

[256] Summary-Judgment Motion – ECF No. 23 at 12.

impact of substance abuse on the claimant. *Bustamante*, 262 F.3d at 954–55. If the ALJ finds that the claimant is not disabled, then the ALJ proceeds no further. *Id.* at 955. If, however, the ALJ finds that the claimant is disabled, then the ALJ conducts the sequential evaluation a second time and considers whether the claimant would still be disabled absent the substance abuse. *Id.* (citing 20 C.F.R. §§ ; C.F.R. § 404.1535, 416.935); *Parra*, 481 F.3d. at 747 (under the Social Security Act's regulations, "the ALJ must conduct a drug abuse and alcoholism analysis" to determine "which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol." (citing 20 C.F.R. § 404.1535(b)).

Here, by rejecting or discounting Dr. Hardey's medical opinion based on Mr. Wilkerson's history of substance abuse, the ALJ failed to conduct the five-step sequential evaluation first before determining the impact of substance abuse on the claimant. *See Bustamante*, 262 F.3d at 954–55. By doing so, it appears the ALJ prematurely assumed that substance abuse was material to the severity of Mr. Wilkerson's mental impairments and rejected Dr. Hardey's opinion on that basis.

Dr. Hardey made an Axis 1 diagnosis of: (1) "Rule out psychotic disorder probably secondary to poly-substance abuse"; (2) "Alcohol, cocaine, and cannabis dependency, in remission, status post 4 months per applicant — no corroborating medical records"; and (3) "Mood disorder, secondary to substance abuse."[257] Dr. Hardey used terms such as "probably" and stated that Mr. Wilkerson's substance abuse was "in remission." She noted the absence of medical records to support a finding of remission, but she did not make any affirmative findings of ongoing substance abuse to contradict Mr. Wilkerson's claim of remission.[258] Moreover, in Mr. Wilkerson's encounters with other health providers, he consistently reported that he had been clean and sober since October 2011, when he began living at Redemption and Recovery.[259]

---

[257] AR 564.

[258] *Id.*

[259] AR 48, 562–63, 622, 635, 641, 644, 652.

Under *Bustamente*, the ALJ must not disregard medical evidence simply because it includes diagnoses of impairments "secondary to" substance abuse at the initial stage of the disability determination analysis. *See* 262 F.3d at 956. Instead, the ALJ must evaluate all of the evidence at each step of the sequential evaluation process "without attempting to separate out the impact" of substance abuse. *Id.* Then, only after making the underlying disability determination, the ALJ must engage in a materiality analysis of the impact of substance abuse on Mr. Wilkerson's impairments. *Id.*

### 3.1.4 Dr. Conger

The ALJ gave no weight to Dr. Conger's disability certificate because it was "not supported by [(i)] any prior treatment relationship or [(ii)] documented positive objective findings."[260]

Dr. Conger examined Mr. Wilkerson sometime during the week of June 13 to June 20, 2011, the period on the form that reflects that Mr. Wilkerson was under Dr. Conger's care.[261] As the ALJ noted, it appears that there is no evidence of an ongoing treatment relationship or basis to consider Dr. Conger as a "treating" medical provider. *See Orn*, 495 F.3d at 631 (ALJ considers length, nature, and extent of treatment relationship and visit frequency); 20 C.F.R. § 404.1527(d)(2)(i)–(ii). Nevertheless, as an "examining" psychologist providing a certificate for Mr. Wilkerson's California disability claim, the fact that Dr. Conger examined Mr. Wilkerson only once is not surprising and does not by itself provide a legitimate basis for rejecting his opinion. *See, e.g.*, *Wiggins v. Berryhill*, No. 16-CV-41-GSA, 2017 WL 772142, at *8 (E.D. Cal. Feb. 27, 2017) (noting that the examining medical opinion was "a one-time snapshot of [claimant's] functioning," but concluding, "that is true of all consultative examiners and it is not a legitimate reason for rejecting the opinion"); *Smith v. Colvin*, No. 14-CV-05082-HSG, 2015 WL 9023486, at *7 (N.D. Cal. Dec. 16, 2015) ("By definition, an examining opinion is a one-time examination.") "Adoption of the ALJ's reasoning would result in the rejection of virtually all examining opinions." *Smith*,

---

[260] AR 24.

[261] AR 528.

2015 WL 9023486, at *7. The ALJ's first stated reason is not a legitimate basis in itself for rejecting Dr. Conger's opinion.

The ALJ's second reason — lack of "documented positive objective findings"[262] — is not supported by substantial evidence. The ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(3)–(6)). Nevertheless, the ALJ's statement — that Dr. Conger provided no positive objective findings — is inaccurate. Dr. Conger's certificate, although brief, states that he found Mr. Wilkerson to be "very disturbed, uncomfortable."[263] In the space for providing a "diagnosis," "objective findings or a detailed statement of symptoms," Dr. Conger wrote that his examination revealed that Mr. Wilkerson "hears voices, feels invaded, wants to be alone, [and] has paranoid ideation, [with] awkward and restless movements."[264] Given that at least some of these noted symptoms are based upon objective observations (as opposed to only subjective reporting by Mr. Wilkerson), the ALJ's stated reason for giving no weight to Dr. Conger's medical opinion is not supported by substantial evidence. Because the ALJ's two reasons for rejecting Dr. Conger's medical opinion are either not legitimate or not supported by substantial evidence, the court finds that the ALJ erred in giving no weight to Dr. Conger's medical opinion. What weight the ALJ ultimately gives to Dr. Conger's assessment given his limited interaction with Mr. Wilkerson must be determined by the ALJ on remand.

### 3.2  Lay Testimony

#### 3.2.1  The Claimant – Mr. Wilkerson

Mr. Wilkerson contends that the ALJ erroneously discredited his testimony.[265] In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an

---

[262] AR 24.

[263] AR 528.

[264] *Id.*

[265] Summary-Judgment Motion – ECF No. 23 at 18–19.

underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted). "The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

Here, the ALJ found that Mr. Wilkerson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. . . ."[266] The ALJ did not make any finding of malingering, but nonetheless discredited his testimony based upon (i) the lack of ongoing, comprehensive treatment and/or the misuse of or failure to take prescribed medicine or treatments (and the corresponding limited "objective medical findings" supporting the severity of his impairments), (ii) the absence of urine toxicology results to support his claim of substance abuse in remission, and (iii) purported inconsistencies between his prior statements and testimony at the hearing.[267] The court addresses each reason.

First, as noted above, the ALJ failed to properly analyze and articulate whether Mr.

---

[266] AR 25.

[267] AR 24–25.

Wilkerson's lack of ongoing comprehensive mental-health treatment and/or his failure to take prescribed medicines or to pursue recommended mental-health treatment was (i) because of a lack of severity of his impairments or (ii) at least in part, the result of his mental-health impairments and/or his inability to pay for such treatments. *See Nguyen*, 100 F.3d at 1465; *Regennitter*, 166 F.3d at 1297–99. The court recognizes (as did the ALJ) that the "objective medical findings" supporting Mr. Wilkerson's disability claim are "limited."[268] Absent this articulated analysis noted above, however, it is not clear whether the ALJ's reliance on this factor (i.e., the "minimal treatment" and "the lack of ongoing comprehensive treatment") to discredit the reported severity of his impairments is legitimate and supported by clear and convincing evidence. *See Molina*, 674 F.3d at 1112.

Second, given the lack of any evidence or indication in the record to the contrary, the ALJ's (and the consulting psychologist Dr. Lace's) discrediting of Mr. Wilkerson's claim of poly-substance abuse remission based upon the *absence* of toxicology results confirming remission does not constitute a clear and convincing basis for finding that Mr. Wilkerson's testimony is not credible. *See generally id.* While the burden of proof at this step of the disability claims process is on the claimant, *Gonzales*, 784 F.2d at 1419, the ALJ's decision offered no specific basis in the record for casting doubt on Mr. Wilkerson's remission. Moreover, the record reflects that during the relevant period of his alleged remission, Mr. Wilkerson was prescribed medication, including opioid pain killers that were occasionally provided for back pain after his several accidents, with no noted abuse.[269]

Finally, while inconsistencies in a claimant's prior statements may be a legitimate basis for discrediting a claimant's testimony, *see Orn*, 495 F.3d at 636, the court finds that on balance those inconsistencies specifically identified by the ALJ in her decision are not sufficient to justify discrediting his testimony. *See Haulot v. Astrue*, 290 F. App'x 53, 55 (9th Cir. 2008) ("minor

---

[268] *See* AR 24.

[269] *See* AR 650–52, 688–89; *see also* AR 644 (although it is not entirely clear whether this was based on his self-reporting or on actual lab tests, Mr. Wilkerson's assessment notes from May 29, 2013, indicate that his "Drug/Alcohol Screen" was negative).

discrepancies in [claimant's] testimony were not enough to establish clear and convincing evidence that [claimant's testimony] is incredible.") (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir.2006)).

First, the ALJ analysis in this area conflates and then finds inconsistent Mr. Wilkerson's statements regarding why he can "no longer work[ ] as a heavy equipment operator" (which the ALJ states that Mr. Wilkerson attributes to his being blind in one eye and to his back pain) with the reason he no longer works at his previous job as a heavy-equipment operator (which he attributes to his hearing voices, depression, and his arrest for public intoxication, which caused him to miss work resulting in his termination).[270] But the reasons for his termination in 2010 and the underlying impairments preventing him from working as a heavy-equipment operator are distinct issues, and Mr. Wilkerson's statements about them are not necessarily going to be consistent. Thus, the fact that those reasons may not always match or overlap does not necessarily impugn his credibility. Moreover, because Mr. Wilkerson suffers from multiple impairments, his statements that he stopped working due to psychiatric symptoms (such as depression and hearing voices), substance abuse, and back pain also are not necessarily inconsistent. Mr. Wilkerson told both Dr. Hardey in February 2012 and the ALJ in October 2013 that he stopped working because he was "hearing voices."[271] He also reported to Dr. Conger in June 2011 (as part of his claim for California disability) that he "stopped working" because of "severe depression – substance abuse problem – back pain" and claimed to hear voices.[272] He similarly testified at the ALJ hearing in October 2013 that he stopped working because he "started hearing voices and started being very depressed" and was fired for being "AWOL" after he was arrested and jailed for public intoxication and missed work.[273]

The ALJ makes a point of noting that Mr. Wilkerson had reported to his social worker that he

---

[270] AR 25; *see also* Summary-Judgment Motion – ECF No. 23 at 17 (noting that Mr. Wilkerson's testimony was actually that he could no longer work as a semi-truck driver — something he had done in the past — because he was blind in his left eye); AR 39.

[271] AR 40, 563.

[272] AR 526, 528.

[273] AR 40–41.

was "laid off in 2010"[274] presumably to show that it was inconsistent with his actually having been fired. Given these circumstances and reviewing the record as a whole, the court finds that this discrepancy (to the extent that it is can be characterized as such) is at most a minor and collateral inconsistency and is not a clear and convincing basis for rejecting his testimony regarding the severity of his impairments.[275] *See Haulot*, 290 F. App'x at 55.

Second, the ALJ noted an inconsistency between Mr. Wilkerson's alleged physical disability due, in part, to his acute glaucoma and limited vision problems in his left eye and Mr. Wilkerson's undertaking a physical on May 2, 2012, for "DMV form completion," and his acknowledgement during his testimony before the ALJ that he currently has his Class A commercial drivers' license.[276] The ALJ also noted that Mr. Wilkerson's longtime friend, Mr. Ivery, reported that Mr. Wilkerson spent a lot of time reading.[277] The ALJ did not, however, note the uncontested findings of Mr. Wilkerson's severe visual-acuity loss in his left eye.[278] Mr. Wilkerson's May 2012 physical exam for DMV purposes and his testimony in October 2013 confirming his commercial Class A license status do raise questions both about the severity of his vision impairment and his underlying overall disability.

Third, the ALJ also identified several purported inconsistencies, such as Mr. Wilkerson's alleged lower-back impairments and his indication in February 2012 that he enjoyed riding his bike and was riding it in April 2013 (before being struck by a car).[279] Although it is possible that his ability to ride a bike is not inhibited by his lower-back infirmities that otherwise prevent him from working, it does arguably call into question the veracity of the other physical limitations that he asserted during his testimony before the ALJ (such as his claim that he could only sit for 20 minutes at a time or stand only for 10 to 15 minutes without his leg going numb).[280]

---

[274] AR 609.

[275] AR 25, 38.

[276] AR 24–25, 39–40, 578.

[277] AR 25, 271.

[278] AR 597.

[279] AR 562, 650–53.

[280] AR 44–45.

Finally, as part of the court's overall review of the record, it appears that there are several notable inconsistencies that the ALJ did not cite in her review of this matter. They relate to various treatment notes generated after Mr. Wilkerson's bike accident in April 2013, when Mr. Wilkerson (at his lawyer's suggestion)[281] went for physical therapy at the Dancy Chiropractic Group.[282] Those notes reflect that Mr. Wilkerson was working during the course of his treatment throughout May 2013, and as such, appear inconsistent with his claim and testimony before the ALJ that he had not worked since 2010.[283] If these work activities constitute "substantial gainful activities," a finding of disability would be precluded under step one of the five-step evaluation process based on this work activity.[284]

For example, the May 1, 2013, treatment notes from the chiropractor state that "[Mr. Wilkerson] reports that his position requires physical work/ a lot of bending, lifting, stooping and sitting."[285] The treatment note then states that he "reports of an increase in low back pain at the end of the day."[286] The May 3rd treatment notes state that Mr. Wilkerson again reports "an increase in lumbar pain associated with prolonged standing and heavy lifting" and that he had "been placed on a light duty assignment while at work" and that "[h]e is precluded from lifting anything over 25 pounds without assistance."[287]

The May 8th treatment notes state that Mr. Wilkerson also reported "an increase in lumbar pain at the end of the day [because] his position requires excessive bending, stooping and standing."[288] He denied "taking over the counter pain medication."[289]

---

[281] AR 650 (follow-up treatment notes from hospital that "[Mr. Wilkerson] is seeing a chiropractor per his lawyer").

[282] AR 700–13.

[283] AR 38 (Mr. Wilkerson claiming that his last job was with Caltrans ending in 2010).

[284] *See* AR 17.

[285] AR 705 (these treatment notes do not specifically identify the type of work or the name of his employer).

[286] *Id.*

[287] AR 704.

[288] *Id.*

[289] *Id.* (the context for this observation is unclear, but to the extent that it is accurate, it supports a finding that Mr. Wilkerson was not following the treatment regime prescribed by his treating

At his May 13th appointment, Mr. Wilkerson stated he is "performing activities which would aggravate his condition," but that "prolong[ed] sitting, standing, stooping and bending are required of his position."[290]

The May 17th treatment notes state that "Mr. Wilkerson is frustrated with aggravating his condition with the activities he is required to perform while at work. He reports that bending and lifting are part of the position's requirements. Mr. Wilkerson reports that he can't afford to take any time off from work. Yet, he reports that he is careful when he is required to perform any activity which would aggravate his condition."[291]

After several further treatment sessions, Mr. Wilkerson reported "an overall improvement in his thoracic spine" and "denie[d] any radiating sensations from his lumbar spine to his lower extremities."[292] His final evaluation report on May 29, 2013 noted that he had "no motor or sensory deficit," could walk "with a normal gait and [ ] without the assistance of any walking device," could get on and off the table without help, and had normal muscle strength.[293] The report concludes that his "prognosis is good."[294]

The treatment notes do not identify Mr. Wilkerson's employer or the type of job position he held. In an earlier separate instance dating back to December 2011, Mr. Wilkerson was treated for back pain complaints.[295] At that visit, Mr. Wilkerson asked for "a work note" from his treatment provider.[296] Again, given his testimony and assertion that he has not worked since 2010, the request in December 2011 appears to be inconsistent with those assertions.

Given the "work" nature of these inconsistencies, these various treatment notes call into question not only the veracity of Mr. Wilkerson's testimony but also the legitimacy of his

physicians – *see* AR 651–52).

[290] AR 703.

[291] AR 702.

[292] *Id.*

[293] AR 712–13.

[294] AR 713.

[295] AR 537

[296] *Id.*

disability claim.

Moreover, it appears that Mr. Wilkerson has not been consistent in reporting his criminal history either. As part of his examination in February 2012 with Dr. Hardey at the request of the State agency, Dr. Hardey specifically noted that Mr. Wilkerson "denied any felony or misdemeanor convictions."[297] In November 2012, as part of his examination with Dr. Khoi, again at the request of the State agency, Mr. Wilkerson reported not having any "legal history."[298] In May 2013, however, Mr. Wilkerson reported that he had a 15-year history of substance abuse that included incarceration for drug-related crimes (from 1997 to 2000 and parole until 2002).[299]

In sum, given these apparent inconsistencies, the court finds that the appropriate action is to remand the case to the ALJ to consider these matters.

### 3.2.2 Mr. Ivery

The ALJ did not give distinct reasons for rejecting the statements that Mr. Ivery made in his third-party function report. Instead, she incorporated by reference the reasons for rejecting Mr. Wilkerson's testimony.[300] Mr. Wilkerson contends the ALJ erred because she did not give specific, germane reasons for rejecting Mr. Ivery's statements.[301]

The ALJ is required to consider "other source" testimony and evidence from a layperson. *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014); *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work") (internal quotation marks and citation omitted). "Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). It is competent evidence and

---

[297] AR 563.

[298] AR 601.

[299] AR 635.

[300] AR 24.

[301] Summary-Judgment Motion – ECF No. 23 at 16–17.

"cannot be disregarded without comment." *Nguyen*, 100 F.3d at 1467. Moreover, if an ALJ decides to disregard the testimony of a lay witness, the ALJ must provide "specific" reasons "that are germane to each witness." *Id.* (internal quotation marks and citation omitted). The Ninth Circuit has not "required the ALJ to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114. An ALJ may "point to" reasons already stated with respect to the testimony of one witness to reject similar testimony by a second witness. *Id.*

Here, because the ALJ relied on the reasons for rejecting Mr. Wilkerson's testimony to also reject Mr. Ivery's statements, whether the ALJ provided germane reasons for discrediting Mr. Ivery's statements turns on reasons intertwined with those particular to Mr. Wilkerson's testimony — some of which are not relevant to Mr. Ivery's statements and others that are insufficiently analyzed or supported. Moreover, because the ALJ did not adequately identify which of Mr. Wilkerson's or Mr. Ivery's specific statements she discredited, it is not clear whether her reasons for discrediting Mr. Ivery's statements are germane. Given these circumstances, the court finds that the ALJ erred by not providing "specific" reasons that are germane to Mr. Ivery. *See Nguyen*, 100 F.3d at 1467.

## CONCLUSION

The court grants Mr. Wilkerson's summary-judgment motion, denies the Commissioner's cross-motion, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 29, 2017

LAUREL BEELER
United States Magistrate Judge